# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPI
### WESTERN DIVISION

**SEFIDKAR JANALI, # 12202-078**                                    **PLAINIFF**

**VERSUS**                          **CIVIL ACTION NO. 5:11-cv-119-DCB-JMR**

**CORRECTIONS CORPORATION OF AMERICA, ET.AL.**          **DEFENDANTS**

### RESPONSE TO DEFENDANTS'
### <u>MOTION FOR SUMMARY JUDGEMENT</u>



SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

FEB 0 6 2012

J. T. NOBLIN, CLERK
BY_____DEPUTY

<u>TABLE OF CONTENTS</u>

Table of Authorities.................................................................. ….........ii

A.     STANDARD TO EVALUATE PLAINTIFF'S
       RELIGIOUS-LIBERTY CLAIMS.............................. …..........2

B.     DEFENDANTS' "VEGETARIAN DIET" IS NOT
       HALAL AND DEFENDANTS CATEGORICALLY
       DO NOT ALLOW MUSLIM INMATES TO BE ON
       THE KOSHER DIET........................................................…..........4

C.     THE JOINT-WORSHIP DEFENSE FAILS TO
       ESTABLISH A LEGITIMATE PENOLOGICAL
       JUSTIFICATION...............................................…........14

D.     CONCLUSION.............................................…........20

       CERTIFICATE OF SERVICE..................................... …..........20

## TABLE OF AUTHORITIES

## CASES

*Adkins v. Kaspar*,
   393 F.3d 559 (5th Cir.2004)..............................................................3

*Alexander v. United States*,
   787 F.2d 1349, 1351-52 (9th Cir.1986)...........................................11

*Barnett v. Rodgers,*
   410 F.2d 995, 998 (C.A.D.C. 1969)..................................................4

*Baranowski v. Hart,*
   486 F.3d 112, 124 (5th Cir.2007).....................................................4,17

*Cooper v. Pate*,
   *378 U.S. 546 (1964).........................................................................14*

*Farmer v. Brennan*,
   *511 U.S. 825, 832 (1994).................................................................15*

*Scott v. Miss. Dep't of Corr.*,
   *961 F.2d 77, 80-81 (5th Cir.1992).....................................................17*

*Turner v. Safley*,
   *482 U.S. 78, 89-91 (1987)................................................................13*

## CONSTITUTION, STATUTES AND RULES

First Amendment.....................................................................................passim
(Free Exercise Clause)

42 U.S.C. § 2000cc-1.............................................................................passim
(Religious Land Use and Institutionalized Persons Act of 2000)

## OTHER AUTHORITIES:

Al-Mufid, Shaykh,
*The Book of Guidance into the Lives of the Twelve Imams,*
translated and annotated by I.K.A. Howard
*of Kitabi al-Irshad,* London, Muhammadi Trust, 1981..........................16

Bureau of Prisons' Practical Guidelines for
*Administration of Inmate Religious Beliefs and Practices*,
T5360.01, Page 7..................................................................................3

*The Community Divided: The Caliphate of Ali*,
translated and annotated Adrian Brockett,
Vol. XVI. Albany State University of New York Press, 1997................16

*The Foundation of the Community*,
translated and annotated W. Montgomery Watt
and M.V. McDonald, Vol. VIII.
Albany State University of New York Press...........................................16

*The Koran*, Part II, 70:173 n. 210...........................................................3

National Advisory Comm'n on Criminal Justice
Standards and Goals, *Corrections* 64 (1973)...........................................14

*Old Testament*, Chapter Eleven of Leviticus..........................................3

*The Succession to Muhammad:*
*A study of the Early Caliphate*,
Cambridge: Cambridge University Press, 1977......................................16

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPI
WESTERN DIVISION**

**SEFIDKAR JANALI, # 12202-078**                                  **PLAINTIFF**

**VERSUS**                                **CIVIL ACTION NO. 5:11-cv-119-DCB-JMR**

**CORRECTIONS CORPORATION OF AMERICA, ET.AL.**       **DEFENDANTS**

**RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGEMENT**

Defendants' position, devoid of serious factual or legal analysis, blatantly discriminates and confers a privilege status to one practicing religion over the other practicing religion and argues that the Court should grant their Motion for Summary Judgment, (Dkt. 11, hereafter "Motion"). Defendants contend that "Plaintiff's claims are ripe for summary judgment because Defendants are not violating Plaintiff's free exercise rights as (a) Defendants' "vegetarian diet and regular inmate diet"[1] are *Halal* or *lawful* for Muslim inmates; and, (b) only one generic Muslim religious service is afforded to alleviate the possibility of sectarian violence and a security threat. *See,* Motion at 3 and 7. Defendants' *catch-22* position rests on a tortured misconception of the governing

---

[1] In the Motion,  pp. 1 at 7, referring to Chaplin Shonebarger's affidavit, Defendants claim that there are two diets that are lawful for Muslim inmates: the vegetarian and the *regular* diet. While in the affidavit at pp. 2 at 7, Chaplin Shonebarger identifies the two diets to be: vegetarian and *Kosher* diet. For the purposes of this response. Plaintiff assumes that the two diets being referred to in the Motion are: vegetarian and *Kosher* diet. Plaintiff reserves the right to supplement this filing in the event it is determined that Plaintiff responded on an incorrect assumption.

Islamic and legal principles and is easily dismissed.

The most striking feature of the Defendants' Motion, is that, other than their bald, unsupported, conclusional number of "facts,"their request for a summary judgment is, in fact, foreclosed or substantially weakened, as they have failed to contradict the substantial burden that Plaintiff has to endure in order to practice his Muslim faith. Defendants further fail to demonstrate through any analysis of the facts of this case that the "substantial burden" they impose on this Plaintiff to practice his Muslim faith is for some "compelling government interest." Indeed, one reading the Defendant's Motion would question whether Chaplin Shonebarger has compelled a declaration of apostasy to the Muslim faith in order to adhere to Jewish Halkhic law.

## A. STANDARD TO EVALUATE PLAINTIFF'S RELIGIOUS-LIBERTY CLAIMS

Contrary to Defendants' assertions, Plaintiff's religious-liberty claims derive from two independent sources: § 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1, *and* the Free Exercise Clause of the First Amendment. RLUIPA protects inmates by providing that a government shall not "impose a substantial burden" on the "religious exercise" [2] of inmates in institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means. 42 U.S.C.§ 2000cc-1(a). RLUIPA creates a private

---

2  RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7) (A).

right of action for violations of § 3, § 2000cc-2(a).

In *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir.2004), the Fifth Circuit determined the definition of "substantial burden" to RLUIPA. After considering the plain wording of the statute, its legislative history, and the Supreme Court's use of the term "substantially burdens" in other contexts, the *Adkins* court held that a regulation creates a "substantial burden" if it "truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *Id.* at 570.

Under RLUIPA the first task is to ascertain whether the challenged government action "substantially burdens" the plaintiff's "religious exercise." The effect of a government action or regulation is "significant" when it either (1) influences the adherent to act in a way that violates his religious beliefs or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and on the other hand, following his religious beliefs. *Id*. The definition, "requires a case-by-case, fact-specific inquiry to determine whether the government action or regulation in question imposes a substantial burden." *Id.* at 571. If the prisoner presents prima facie evidence of a substantial burden, the government is required to demonstrate that its action was supported by a compelling interest and that the regulation is the least restrictive means of carrying out that interest. *See* 42 U.S.C. § 2000cc-2(b)

A government regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit

that is not otherwise generally available or acting in a way that is not otherwise generally allowed. *Id.*

### B. DEFENDANTS' "VEGETARIAN DIET" IS NOT HALAL AND DEFENDANTS CATEGORICALLY DO NOT ALLOW MUSLIM INMATES TO BE ON THE KOSHER DIET.

It is undisputed that Plaintiff is a Shia Muslim, who believes that the Koran directs Muslims not to consume pork and to refrain from aiding others to consume pork in any circumstances. *See,* The Koran, Part II, 70:173 n. 210 ("He has forbidden you ... the flesh of swine."). Islamic scholars have also endorsed Chapter Eleven of Leviticus in the Old Testament, which prohibits adherents from handling swine. *Cf. Barnett v. Rodgers,* 410 F.2d 995, 998 (C.A.D.C. 1969) (finding that the ban is absolute, and extends to all pork products and to all food prepared with pork derivatives). *See also*, Affidavit of Chaplin Shonebarger, (hereafter, "Shonebarger Affidavit") at 8 ("Islamic law specifies which foods are halal ("lawful") and which foods are haram ("unlawful")). *See,* Affidavit of Plaintiff Sefidkar, (hereafter, "Sefidkar Affidavit") at 2 (Bureau of Prisons' (hereafter "BOP") Practical Guidelines for Administration of Inmate Religious Beliefs and Practices, T5360.01, Page 7, outlining Islam Dietary Standards).

It is also undisputed that Plaintiff has acted in accordance with this interpretation of his religion throughout his incarceration, and the sincerity of his religious beliefs, including, observing strict dietary restriction pursuant to Islamic law is not contradicted. Shonebarger Affidavit at 3, 9. *See for e.g. Baranowski v. Hart,* 486 F.3d 112, 124 (5th

Cir.2007) (stating that "[t]here is no question" that keeping kosher is a religious exercise for purposes of RLUIPA)

It is further undisputed that Chaplin Shonebarger is not a certified expert in Islamic Dietary standards as well as Halal food production, processing, preparation and serving  techniques and standards. *See,* Sefidkar Affidavit at 6 and 24.

It is further undisputed that Defendants have never, since the opening of the institution, received a certification that this facility is Halal compliant in production, processing, preparation and serving techniques and standards after a Halal audit by a registered Halal auditor. *See*, Sefidkar Affidavit at 25.

It is further undisputed that Plaintiff and Defendants unequivocally agreed that Plaintiff, in exchange for a agreeing to follow the prison's Special Diet For Religious Reasons program, would follow the adherents, as well as the usual and standard practices of *only* the Islamic faith. <u>*See*</u>, Sefidkar Affidavit at 2.[3] However, despite the aforesaid agreement between the Plaintiff and Defendants, it is further undisputed that Plaintiff was removed from the Special Diet For Religious Reasons, as:

---

3      a. Part C of the said Agreement states in pertinent part:
I will observe the usual and standard practices of ***my*** (Muslim) religious preference, as defined by ***my*** (Muslim) religious group...(emphasis added).

b. Part D of the Agreement states in pertinent part:
I will not violate the usual and standard dietary practices of ***my*** (Muslim) religious preference by consuming anything incompatible with my religious diet. (emphasis added).

"... Inmate Sefidkar ... wanted to order clams off the commissary. Clams are lawful under Islamic law but not under Jewish law so inmate Sefidjar was taken off the Kosher[4] diet after multiple violations..."

*See*, Shonebarger Affidavit at 9-10.

The summary judgment record reflects a number of disputed facts pertinent to the, "substantial burden without any compelling government interest by the least restrictive means" inquiry.

**First Disputed Fact:** As an illustration of Defendants' lack of candor and blatant misrepresentations of material facts, while Chaplin Shonebarger, asserts under oath, that: At ACCF there are *two* diets that are halal or lawful for Muslims. The *vegetarian* diet is completely lawful for Muslims to eat. In addition, the *Kosher or Jewish* diet is also lawful for Muslims; *Id* at 8. and further fabricates facts by asserting: that Muslim inmates at ACCF are allowed to be on *either* diet. (emphasis added).  *Id.* at 9

Chaplin Shonebarger does not, *practice what he preaches,* contrary to the position taken in this case, Defendants, in fact, do not permit Muslim inmates to be on the Kosher diet, to wit:

"After reviewing your personal beliefs  and the religious dietary standards of your religion (Muslims faith). I do not see the requirement for a Kosher diet. The Vegetarian diet provides pork free products and food items and is verified by the Canteen Dietitian you may choose that as a possibility. In addition Islam does not require a Jewish Kosher diet. Your request is denied." *See* Sefidkar Affidavit at 3 … "**A Muslim does not qualify for a Jewish diet** (emphasis added)" *See Id.* At 4.

---

4  The only Special Diet for Religious Reasons afforded to Muslims was a Kosher diet. ACCF have never had a *per se* Muslim diet.

**Second Disputed Fact:** Contrary to Chaplin Shonebarger's bald assertion: "The vegetarian diet is *completely lawful* for Muslims to eat (emphasis added)" <u>See</u>, Shonebarger Affidavit at 8. Defendants' fail to demonstrate through any analysis of the facts of the case the basis of its bald assertions:

In fact, (1) the bread served in the vegetarian tray is made with lard. The source for the lard is obtained by extracting the fat from the swine particularly found in the abdominal cavity and therefore not Halal or unlawful under Islamic law.

(2) The Jelly that is served in the vegetarian tray contains gelatine. The gelatine is obtained (by boiling in water) from the partial hydrolysis of collagen derived from cartilage, bones, tendons and skin in animals and therefore not Halal or unlawful under Islamic law.

(3) The margarine used as a substitute for butter served in the vegetarian tray is not Halal, as it contains animal fats, whey and gelatine and therefore unlawful under Islamic law.

(4) The cheese that is served in the vegetarian tray is not Halal, as it contains Rennet or Rennin, an enzyme taken from the stomach of a newly killed calf used in the cheese making process and therefore unlawful under Islamic law.

(5) The shortening used to prepare food products that are served on the vegetarian tray is not Halal, as it contains a minimum 10% - 20% animal fat and therefore unlawful under Islamic law.

(6) The tallow used to prepare food products that are served on the vegetarian tray is not Halal, as it is derived from fats from either cattle or beef and therefore unlawful under Islamic law.

(7) Whey and Whey Powder, used to prepare food products that are served on the vegetarian tray is not Halal, as the watery part of milk that separates from the curd when the milk sours and becomes coagulated or when cheese is made contains Rennet and therefore unlawful under Islamic law.

(8) Biotin found in egg yolks, cereals and milk and used to prepare food products such as that are served on the vegetarian tray is not Halal and therefore unlawful under Islamic law.

(9) Diglyceride an emulsifier, used to prepare food products that are served on the vegetarian tray is not Halal, as it is normally from swine and therefore unlawful under Islamic law.

(10) Dry Artificial Colors, used to prepare food products that are served on the vegetarian tray is not Halal, as it is normally extracted with alcohol and therefore unlawful under Islamic law.

(11) Bile Salts, used to prepare food products that are served on the vegetarian tray is not Halal, as whenever the fat needs to be emulsified to easy digestion fat from swine is used and therefore unlawful under Islamic law.

(12) E-Carotene (coloring) (alpha, beta, gamma), used to prepare food products

that are served on the vegetarian tray is not Halal, as it contains Glycerine that is normally derived from swine and animal fat and therefore unlawful under Islamic law.

(13) Edible fats used to prepare food products that are served on the vegetarian tray is not Halal, as it is normally derived from swine and animal fat, and therefore unlawful under Islamic law.

(14) The pans containing vegetarian items are not Halal as they are cross-contaminated from other food preparation and have not been cleaned properly.

Generally, vegetarian dishes are halal unless they have been otherwise contaminated, such as coming into contact with haram foods or being cooked or served in containers that have been in contact with haram foods without being properly cleaned. Such cross-contamination renders the halal foods haram and therefore unlawful under Islamic law.[5]

(15) Halal products contaminated with any of the Haram items during production, processing, preparation and/or serving food also become Haram, when one is aware of such contamination.[6]

(16) More importantly the meats served in the regular tray do not adhere to the

---

5  Defendants have no procedure in place, nor have they demonstrated, that the vegetarian diet is in fact Halal compliant and the food served in the vegetarian tray cannot get cross-contaminated by the meat and other foods provided and processed in the regular diet.

6  Unlike the Kosher diet, the the root cause for cross-contamination is the tray used for the regular diet as it is also the same tray used and processed for the vegetarian diet.

strict requirements for making the meat Halal.  The animals have to be slaughtered by a

Muslim in a prescribed Islamic manner.

(17) The following requirements are noted for slaughtering "wholesome meat":

The animal should be inspected by an Imam before it is slaughtered, and found to be

healthy; The animal should be slaughtered in such a way as to allow its blood to flow

out freely and completely, i.e., with a sharp tool cutting the main veins and the throat;

No other than the name of Allah is to be invoked at the time of slaughtering; The name

of Allah should be invoked over the animal at the time of slaughter, e.g., "With the name

of Allah, Allah is Supreme;" The meat should be inspected to ensure that it is wholesome

and does not contain any matter injurious to human health. The person who slaughters

the animal may be a Muslim, Jew, or certain Christians, but not an atheist, pagan, or

polytheist;  Muslims would eat meat slaughtered by Christians or Jews who also refrain

from eating pork, i.e., Seventh Day Adventists, etc.; other Christians or Jews may not be

careful of utensils.

It is, thus, questionable whether the vegetarian diet, in fact, contains *any* halal

foods, because, even if the The vegetarian diet by a stretch is *completely lawful* for

Muslims to eat, the food items on the vegetarian tray would have been cross-

contaminated by prisoners and food preparation workers dropping haram products into

the vegetarian items or inmates having used their hands to serve themselves. *See,*

Sefidkar Aff. at 6-27.

**Third Disputed Fact:** It is further disputed, in light of the Plaintiff's sincerely held religious beliefs as a Shia Muslim, how and in what manner have the Defendants established that the "vegetarian diet is *completely* lawful for Muslims to eat." (Shonebarger Affidavit at 8). And what measures are in place to ascertain whether the "vegetarian diet " continues to remain in compliance with Halal or Islam law standards.

At the summary judgment stage, in resolving the disputed facts in favor of the Plaintiff. The Court must conclude that, in fact, the vegetarian diet is *not complaint with Muslim law* and thus, unlike the situation for Jewish inmates who receive Kosher meals, according to strict adherence of the Jewish Halakhic law, the vegetarian meals provided by Defendants to Muslims as their Religious diet is *prohibited* and *unlawful* for Muslims to eat. *Cf.* Shonebarger Affidavit at 7.

**Fourth Disputed Fact,** While Defendants, based on their fabrications assert, indicate that they are perfectly capable of providing Kosher meals to Muslim inmates. There is no indication that the Defendants discussed, let alone demonstrated, why the Jewish inmates are not provided the "vegetarian diet" especially when according to Chaplin Shonebarger, Kosher diets could be consumed by Muslim and Jewish inmates, in the same vein and applying the same logic, vegetarian diet, too, could replace the Kosher diet for Jewish inmates.  Defendants were provided a cost-effective and in fact a less expensive alternative than the Kosher diet to alleviate this institution's  Religious diet problem. Defendants arbitrarily rejected it, holding in pertain part, that the

vegetarian diet is a viable alternative to Kosher diet for Muslim inmates only. *See*, Sefidkar Affidavit at 1. *What's good for the goose should be good for the gander*?

**Fifth Disputed Fact:** A factual dispute exists as to the circumstances under which Defendants allow Muslim inmates to receive Kosher meals and whether, as a result, it places a substantial burden on the Muslim inmates to adhere to Jewish dietary laws. In fact, it is not disputed that the policy of not providing a halal diet and relying on a Vegetarian diet, that is not close to being halal complaint, imposes a substantial burden on the Plaintiff's religious-liberty beliefs and also calls into question whether the "compelling government interest by the least restrictive means" violates the Equal Protection Clause and in fact a discrimination inherent in the Defendants' Religious -Liberty policy by contravening it's own policy. *See,* Sefidkar Affidavit at 6.

To decline to permit a jury hear the Plaintiff's challenge to the Defendants discriminatory Religious-liberty practices, that is the product of a grossly fabricated and misrepresented factual basis that Defendants "vegetarian diet is *completely* lawful for Muslims to eat." as well as "Muslim inmates at ACCF are allowed to be on *either* diet." would be to permit the defendants, to, not only trample with impunity on one of the most fundamental and non-exemptable safeguards afforded under the § 3 of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc-1, *and* the Free Exercise Clause of the First Amendment, but also deny recourse to an injured individual, whose rights, under the non-exemptable provisions of the RLUIPA and the Constitution,

have been deliberately subverted through intentional, carefully calculated, misconduct. Plaintiff has, thus, established a prima facie case, that defendants fail to counter as a matter of law.

Where a plaintiff adduces evidence sufficient to show that the Defendants' practice substantially burdens his religious exercise, the onus shifts to Defendants to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest. *See*, 42 U.S.C. § 2000cc-2(b). None of the aforesaid disputed and undisputed facts establishes that Defendants have a "compelling government interest and it is reasonably related to any legitimate penological interest" to deny Plaintiff a Halal diet similar to that afforded to the Jewish inmates. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). Without a Halal diet, Plaintiff's ability to practice his religion in this facility is severely compromised.

Other than their whims, fabrication and attempts to mislead the Court, Defendants do not even come close to meet their burden to sustain their Motion for Summary Judgment, accordingly, defendant's Motion for Summary Judgment should be denied in order to compel Defendants to bring their "vegetarian" tray in accordance to Islamic Law. *See*, Sefidkar Affidavit at 1.

## B. THE JOINT-WORSHIP DEFENSE FAILS TO ESTABLISH A LEGITIMATE PENOLOGICAL JUSTIFICATION.

Defendants argue that, based on the facts established, Plaintiff fails as a matter of law to meet his prima facie burden of demonstrating that Defendants substantially burdened his right to free exercise of religion by not providing separate Sunni and Shi'ite services. Defendants also argue that legitimate penological concerns about security, as well as fiscal, space, and staffing limitations, justifies the joint services of which Plaintiff complains.

Defendants claim that Plaintiff's alternative means of prayer is to "pray individually in his cell ... Motion at pp. 4 § B. and assert that there is a *potential* for sectarian violence, for separate Shia group worship. *See,* Shonebarger Aff. at 4 and 5.

It is however, disputed whether Defendants have provided Plaintiff with "the least restrictive alternative," to achieve its interests as Defendants may not deprive a detainee of his liberty to an extent greater than necessary. Especially when, just as Sunnis' worship, it has been long been regarded that Congregate services and group-services are a hallmark of Shia worship, and in fact, in the prison context, group religious services, have long been encouraged, in part in recognition of the value of religion in rehabilitating prisoners, in part in keeping with the historic religious roots of American prisons, and in part because officials have long acknowledged that regular releigious services can actually enhance the security of the institution. National Advisory Comm'n on Criminal Justice Standards and Goals, *Corrections* 64 (1973). *See also,* Sefidkar

Page 14

Affidavit at 28

The fact that defendants have granted specific privileges and benefits to the "12
active faith groups, for example: *five* sects of Judaism, *six* sects of Christianity, *three*
sects of Rastafarianism and *ten* sects of Orisha," to including, but not limited to,
Congregate and worship as a group. *See*. Shonebarger Affid at 4. There seems no real
justification that by adding one additional sect to the Muslim faith group would create a
possibility of sectarian violence. In fact it could be disputed that the possibility of
sectarian violance would be greater if not equal as a result of the *five* sects of Judaism,
*six* sects of Christianity, *three* sects of Rastafarianism and *ten* sects of Orisha.

In fact the very reason that there are *five* sects of Judaism, *six* sects of Christianity,
*three* sects of Rastafarianism and *ten* sects of Orisha should give rise to a presumption
that those privileges and benefits of having different sects, serves a legitimate
penological purpose, and hence cannot be denied, *a fiotariri* the wholesale denial to Shia
Muslims of the exact same privileges and benefits, lifts the cloak of the presumption of
that the Shia Muslims are denied to conduct a separate group service have any legitimate
penological purpose. Defendants' distribution of privileges based on security, as well as
fiscal, space, and staffing limitations, looses its presumption of legitimacy, and the
burden shifts to Defendants to show that plaintiffs' special suffering is not gratuitous, but
that it is justified by a legitimate penological goal.

Certainly, prison officials have a strong interest in protecting sectarian violence or

any violence to that effect, and Plaintiff agrees that even his prerogative, too, is not to promote any type violence whatsoever. Failure to do so could also subject Defendants to substantial liability. *See, Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (noting that prison officials must "take reasonable measures to guarantee the safety of the inmates ...").

On its face, it may therefore appear, based on Chaplin Shoneberger's assertions, notwitstanding the Sunni group-services on Wednesdays and Fridays[7], that the prison officials are entirely justified in denying Plaintiff his right to separate group service as a Shia Muslim. The question that remains, however, is whether denying Plaintiff the opportunity of a separate group service as a Shia Muslim was justified under the First Amendment and RLUIPA as well as whether it justifies by a legitimate penological goal.

Even if denying this Shia Muslim the opportunity to a separate group service as a Shia Muslim may be reasonably related to the prison's interest in insuring security, as well as fiscal, space, and staffing limitations and even if the defendants may be correct that denying Plaintiff the opportunity to a separate group service as a Shia Muslim and

---

7 Chaplin Shoneberger, by calling it Muslim worship, affords only the Sunni Muslim Group to congregate for religious services on Wednesdays from 5:30 pm – 8:00 pm (two and one-half hours) and on Fridays from 1:00 pm – 2:50 pm. (approx three hours). With what is accomplished during these two time periods. Chaplin Shoneberger could easily and amicably divide the time allocated between the two groups and each group could easily accomplish their desired objectives. Not even the separate Grand Mosques of Sunni or Shia worshipers require that much of allocated times to achieve what is being achieved during these two time periods. *See,* Sefidkar Aff. at 31-32.

therefore under the circumstances of this case the defendants have not violated his rights under the Free Exercise Clause of the First Amendment.

The same cannot be said, however, with respect to his rights under RLUIPA. Defendants have made <u>no</u> showing that denying this Plaintiff the opportunity to attend separate group Shia services and instead to pray individually, is the *least restrictive means* of insuring that sectarian violence would not arise, especially when, the Sunnis are permitted to pray separately and as a group, it is undisputed that:"five sects of Judaism, six sects of Christianity, three sects of Rastafarianism and ten sects of Orisha," are permitted to congregate and worship as a group when they do not have a problem praying together. *See,* Sefidkar Affidavit at 31.

When for the past 1,400 years the world as a whole have not been able to alleviate sectarian violence between Sunni and Shi'ite based on their ideological issues and consequently they pray separately, have separate mosques and more importantly have an entirely different manner and method of service,[8] forcing them to pray together with

---

8. *See for eg:*

(a) *The Foundation of the Community*, translated and annotated by W. Montgomery Watt and M.V. McDonald, Vol. VIII. Albany State University of New York Press, 1987;

(b) *The Community Divided: The Caliphate of Ali*, translated and annotated Adrian Brockett, Vol. XVI. Albany State University of New York Press, 1997;

(c) *The Succession to Muhammad: A study of the Early Caliphate*, Cambridge: Cambridge University Press, 1977;

(d) Al-Mufid, Shaykh, *The Book of Guidance into the Lives of the Twelve Imams,*

with a history of sectarian violence when they are clubbed together, sounds illogical and in fact contravenes any legitimate penological goal. More importantly, the very fact that Sunni and Shi'ite inmates are repeatedly requesting separate services based on differences in ideologies, lends credibility to Plaintiff's position in promoting a legitimate penological goal and security within the prison system, especially when the Sunni Muslims are provided an opportunity for a separate group worship. Thus, Plaintiff's claim that the defendants violated his rights by denying him the opportunity to attend a separate Shia group service must remain. Sefidkar Affidavit at 29-30

The Court cannot find that Defendants were worried that separate services of Sunni and Shia Muslim services would endanger inmates, or were short on space for separate services, or had some other reason. "A court 'must determine whether the government objective underlying the regulation at issue is legitimate and neutral, and that the regulations are rationally related to that objective.' " *Baranowski v. Hart*,486 F.3d 112, 120 (5th Cir. 2007); *see also*, *Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 80-81 (5th Cir.1992) (explaining that a court need not "weigh evenly, or even consider, each of these factors," as rationality is the controlling standard).

Defendants incorrectly cite, *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir.2007), for this proposition. There, the defendants demonstrated that a compelling governmental interest in eliminating diets existed only after they *established* that 1) the

---

translated and annotated by I.K.A. Howard of *Kitabi al-Irshad*, London, Muhammadi Trust, 1981.

Texas Department of Criminal Justice budget was not big enough to either provide a separate kosher kitchen or bring in kosher food from the outside and simultaneously provide a nutritionally appropriate meal to other offenders, and 2) that such a policy would breed resentment among inmates that would result in a security risk, and 3) that there would be an increased demand by other religious groups for similar diets. *Id.* at 125. As such, in *Baranowski*, an increase in costs was only one factor among several, including a security risk that collectively supported a compelling government interest.

Although the facts at trial might show otherwise, at this stage, the unchallenged and unresolved factual allegations as viewed in the light most favorable to Plaintiff establishes that Plaintiff's free-exercise rights were substantially burdened by Defendants joint-worship policy and cannot be justified by a legitimate penological interest or, *a fortiori*, the compelling governmental interest required by RLUIPA. These facts show the violation of both RLUIPA and First Amendment free-exercise rights. Summary Judgment is not appropriate at this stage because it is clearly established at the time of the alleged violations that prison officials may not substantially burden inmates' right to religious exercise without some justification and because the Court cannot say as a matter of law that it was objectively reasonable for any defendant to believe that the facts as they stand on summary judgment showed no violation of a clearly established right.  Accordingly, these issues remain to be resolved in further proceedings.

## D. **CONCLUSION**:

For the foregoing reasons it is requested that the Honorable Court deny

Defendants Motion for Summary Judgment in its entirety, and provide the Plaintiff any

further or other relief as the Honorable Court deemes just and fair.

Dated: February ⎯O⎯|⎯ 2012             Respectfully submitted,

Sefidkar Janali, # 12202-078
Plaintiff, Pro se.
ADAMS COUNTY CORRECTIONAL
CENTER
P.O. BOX 1600
WASHINGTON, MS 39190

## CERTIFICATE OF SERVICE

I, JANALI SEFIDKAR, hereby certify that I served the:

RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT;

which is deemed filed at the time it was deposited at Adams County Correctional Center's depository for legal mail in accordance to *Houston v. Lack*, 108 S.Ct 2379 (1988), by placing the aforesaid brief in a sealed first class postage paid envelope addressed to:

CLERK OF THE COURT
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPI
WESTERN DIVISION.
P.O. BOX 23552,
JACKSON, MISSISIPPI, 39225

As this case is designated as an E-Filing case, the Clerk is requested to kindly forward this filing to all other parties signed to receive electronic notifications from the Court regarding this case.

SO CERTIFIED, this the _o1_ day of February 2012.

Sefidkar Janali, # 12202-078